UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
LAMONT PETTUS,

                         Plaintiff,

           - against -

CITY OF NEW YORK, et al.,
                            Defendants.
--------------------------------------------------------X

REPORT AND
RECOMMENDATION

10-CV-1442 (CBA) (JO)

James Orenstein, Magistrate Judge:

      Plaintiff Lamont Pettus ("Pettus"), acting *pro se*, filed this action against New York City

police officers Michael Scarcella and Joseph Lamassa ("Scarcella" and "Lamassa" or, collectively,

the "Police Defendants"); and assistant district attorneys ("ADA") Johanne Macayoux and ADA

Richard Boye ("Macayoux" and "Boye" or, collectively, the "Prosecutor Defendants"), among

others, and accused them of violating his civil rights by subjecting him to a false arrest and

malicious prosecution for a shooting he says he did not commit. *See* Docket Entry ("DE") 1

("Complaint"). On January 10, 2011, the Police Defendants and the Prosecutor Defendants moved

for summary judgment on all claims. DE 51. Upon a referral from the Honorable Carol B. Amon,

Chief United States District Judge, *see* Order dated December 22, 2010, I now make this report,

and for the reasons set forth below, respectfully recommend that the court grant the defendants'

motion in its entirety.

I.    <u>Background</u>

      Except where noted, the facts described below are undisputed. Strictly speaking, there are

*no* pertinent factual disputes: Pettus did not file a response to the defendants' statement of

undisputed facts pursuant to Local Civil Rule 56.1, DE 53, despite the fact that the defendants'

counsel provided the required notice informing him of the relevant local rules. *See* Loc. Civ. R.

56.1 & 56.2; DE 54. As a result, all of facts set forth in the defendants' Rule 56.1 statement are uncontroverted and may be deemed admitted. *See* Loc. Civ. R. 56.1(c). On that basis alone, the court can and should grant the motion for summary judgment. Nevertheless, in the event the court declines to resolve the motion on that basis, in the remainder of this report I treat as disputed any fact as to which there exists any evidence in the record that supports a proposition at odds with the defendants' contentions. That record includes the following submissions, to which I will refer using the abbreviations noted below:

| *Docket Entry* | *Description* | *Abbreviated Citation* |
|---|---|---|
| 1 & 18 | Plaintiff's Complaint | "Complaint" |
| 48 | Pettus Affidavit in Opposition to Motion | "Pettus Aff." |
| 48-1 at 3-7 | Trial testimony of Michael Scarcella | "Scarcella Tr." |
| 48-1 at 8-20 | Trial testimony of Aaron Floyd | "Floyd Tr." |
| 52 | Declaration of Matthew Modafferi | "Modafferi Dec." |
| 52-5 (Ex. D) | Affidavit of Joseph Lamassa | "Lamassa Aff." |
| 52-6 (Ex. E) | Affidavit of Michael Scarcella | "Scarcella Aff." |
| 52-7 (Ex. F) | Affidavit of Johanne Macayoux | "Macayoux Aff." |
| 52-8 (Ex. G) | Affidavit of Richard Boye | "Boye Aff." |
| 52-9 (Ex. H) | Dubose 911 Radio Call Transcript | "911 Tr." |
| 52-10 at 1 (Ex. I) | Michael Sullivan Report dated April 1, 2007 | "Sullivan Report" |
| 52-10 at 2 (Ex. I) | Kevin McDonough Report dated April 1, 2007 | "McDonough Report" |
| 52-11 (Ex. J) | Joseph Lamassa Report (Bates NYC 11) | "Lamassa Report I" |
| 52-12 (Ex. K) | Joseph Lamassa Report (Bates NYC 16) | "Lamassa Report II" |
| 52-13 (Ex. L) | Joseph Lamassa Report (Bates NYC 19) | "Lamassa Report III" |
| 52-14 at 1 (Ex. M) | Joseph Lamassa Report (Bates NYC 22) | "Lamassa Report IV" |
| 52-14 at 2 (Ex. M) | Joseph Lamassa Report (Bates NYC 23) | |
| 52-14 at 3 (Ex. M) | Joseph Lamassa Report (Bates NYC 25) | "Lamassa Report VI" |
| 52-14 at 4 (Ex. M) | Joseph Lamassa Report (Bates NYC 26) | "Lamassa Report VII" |
| 52-15 (Ex. N) | Joseph Lamassa Report (Bates NYC 30) | "Lamassa Report VIII" |
| 52-16 (Ex. O) | Grand Jury Indictment of Lamont Pettus | "Pettus Indictment" |
| 52-17 (Ex. Q) | Transcript of Interview of Aaron Floyd | "Floyd Int." |
| 53 | Defendants' Rule 56.1 Statement | "Def. Statement" |
| 55 | Defendants' Memorandum of Law | "Memo." |
| 56 | Defendants' Reply Memorandum of Law | "Reply Memo." |

On March 31, 2007, Aaron Floyd ("Floyd")[1] and his girlfriend Nadine Dubose ("Dubose") were together in Dubose's apartment when Pettus came to the apartment door. Floyd opened the door and spoke briefly with Pettus, refused to allow Pettus to enter the apartment, and then closed the door. Floyd did not see anyone with Pettus during their conversation. After closing the door on Pettus, Floyd turned around to walk further into the apartment. Seconds later, two gunshots came through the door and struck Floyd in the back, severely injuring him.[2]

Dubose called 911 to obtain assistance. Officer Scarcella was the first responder to arrive. Def. Statement ¶ 8; Scarcella Aff. ¶¶ 3-4. He found Floyd bleeding heavily and shouting, "he shot me[.]" Scarcella Aff. ¶¶ 4-5. When Scarcella asked Floyd who was responsible, Floyd replied "Lamont" and provided a description of the man's age, height, and clothing. Def. Statement ¶ 10; Scarcella Aff. ¶¶ 6-8.[3]

Officer Lamassa arrived next, accompanied by Detectives Michael Sullivan and Kevin McDonough ("Sullivan" and "McDonough", respectively), and Scarcella briefed all of them. Def. Statement ¶¶ 13-14; Sullivan Report; Lamassa Aff. ¶¶ 4-5. McDonough interviewed Floyd, who repeated that "Lamont" had shot him, and added that "Lamont" resided at 1000 President Street. Def. Statement ¶ 15; Lamassa Aff. ¶ 7; McDonough Report.

Lamassa interviewed Dubose, who told him what happened after she heard the doorbell ring. She reported that Floyd answered the door, said "not now" to the visitor, and then slammed the door. Dubose further told Lamassa that after the door was closed, two gunshots were fired

---

[1] Floyd's first name is occasionally rendered as "Arron" in the record. *See* DE 48-1 at 21-23.

[2] Pettus contends that the shots were fired ten minutes after he left the apartment door – that is, at a time when there would be no reason to assume he was the shooter. *See* Pettus Aff. ¶ 15. As discussed below, the evidence on which he relies for that argument does not support such an inference.

[3] *See* n.4, *infra*.

through it, striking Floyd in the back, and that she then called 911 for assistance. Def. Statement ¶ 16; Lamassa Aff.¶¶ 8-12; Lamassa Report I; *see also* 911 Tr. In addition, Dubose told Lamassa that Floyd had told her that "Lamont" had shot him; she also reported that "Lamont" had been showing up at her apartment asking for his money. Lamassa Aff. ¶ 11-13.

Later that night, Lamassa interviewed Floyd in the hospital emergency room. Lamassa showed Floyd a photograph of Pettus, and Floyd identified it as a photograph of the person who had shot him. Def. Statement ¶ 21; Lamassa Aff. ¶ 19; Lamassa Report II.[4] Likewise, in the early

---

[4] Pettus contends that there is a material factual dispute as to whether Floyd identified him as the assailant, notwithstanding the fact that, as described below, the record includes a transcript of Floyd's sworn statements during an interview on April 9, 2007, in which Floyd repeated the accusation. In doing so, Pettus relies on the following testimony from his criminal trial, in which Floyd not only disavowed the prior accusation but also denied having told the police that "Lamont" shot him.

MR. BOYE [prosecutor]: Do you know who shot you?

MR. FLOYD: No, I don't. At the time the police was like, this is the person that shot you? I was like, man, I don't know. He said, who was at your door? That's what they kept saying, who was at your door?

MR. BOYE: When was that?

MR. FLOYD: All the time after they're trying to ask me this as I was going to the hospital. I was in and out of consciousness. They showed me a picture and they said that was Lamont –

MR. BOYE: Who showed you the picture?

MR. FLOYD: The detective.

MR: BOYE: When was that?

MR. FLOYD: Before like, a couple of days before I left. I can't be sure of the date, like 6th or 7th.

MR: BOYE: So a detective showed you a picture of Lamont at the hospital?

MR. FLOYD: Yes.

morning hours of April 1, 2007, Dubose went to the police precinct and viewed an array of five photographs; from that array, she identified a picture of Pettus as the person she knew as Lamont. Lamassa Aff. ¶¶ 20-21; Lamassa Report III.

Based on the evidence gathered up to that point, at 2:00 a.m. on April 1, 2007, Lamassa went to 1000 President Street – the address Floyd had provided to McDonough at the scene of the shooting – to arrest Pettus. Pettus's mother, who lived there, told Lamassa that her son was not home and that she did not know how to contact him. She informed Lamassa that her son reported to probation officer Karen Hill on Tuesdays. Lamassa contacted Hill, who confirmed that Pettus had an appointment with her on Tuesday, April 4, 2007, and agreed to alert him when Pettus was at her office. Accordingly, when Pettus arrived at Hill's office on April 4, 2007, Hill advised Lamassa

---

MR: BOYE: You told him that was Lamont?

MR. FLOYD: Yeah. I said, yeah, that's him.

MR: BOYE: You never told him that Lamont shot you?

MR. FLOYD: No.

MR: BOYE: That's your testimony?

MR. FLOYD: Yes.

Floyd Tr. at 10-11.

I note that it is not at all clear that Pettus can properly rely on such testimony in opposing the motion for summary judgment. Floyd has not been deposed in this case and apparently will not testify. *See* n.8, *infra*. As a result, there is no reason to believe that the trial testimony on which Pettus relies – which neither the defendants in this case nor any party with a sufficiently similar motive had an opportunity to impeach through cross-examination – could be admitted over the defendants' hearsay objection. *See Weinstein's Federal Evidence* § 804.04 ("If the opportunity to cross-examine was lacking, the prior testimony must be excluded.") (citing *United States v. Jackson*, 335 F.3d 170, 177-78 (2d Cir. 2003); *United States v. Peterson*, 100 F.3d 7, 11-12 (2d Cir. 1996)).

of that fact. Lamassa went to Hill's office and arrested Pettus. Lamassa Aff. ¶¶ 23-29; Lamassa Report IV; Lamassa Report VI; Lamassa Report VII; Lamassa Report VIII.

On April 9, 2007, ADA Dennis Brogan ("Brogan") interviewed Floyd, who was still in the hospital. Def. Statement ¶ 33; Floyd Int. at 1. The interview was videotaped and conducted under oath, and a transcript is part of the record in this case. Floyd stated that on the night of the shooting, Lamont came looking for a place to spend the night; Floyd told Lamont it was not a good time and closed and locked the door. Def. Statement ¶¶ 34-35; Floyd Int. at 1-2, 2-4. Five to six seconds later, two gunshots came through the door and struck him in the buttocks. Def. Statement ¶ 36; Floyd Int. at 4. Floyd affirmed that the police had shown him a picture of Pettus and that he had stated, "yes, that's him." Def. Statement ¶ 39; Floyd Int. at 6-7.

On April 23, 2007, ADA Macayoux presented the case against Pettus to a grand jury; the evidence she presented included the videotape of Floyd's interview. Def. Statement ¶¶ 41-42; Macayoux Aff. ¶¶ 2-3. The grand jury indicted Pettus on charges of reckless endangerment, assault, and criminal possession of a weapon. Macayoux Aff. ¶ 4; Pettus Indictment. The criminal case went to trial nearly a year later: ADA Boye began presenting the case to the trial jury on April 18, 2008. Def. Statement ¶¶ 44-45; Boye Aff. ¶¶ 2-4. After Floyd testified that he did not know who shot him and that he had never told the detectives that Pettus was his assailant, *see* Floyd Tr. at 10-11, Boye moved to dismiss the indictment for insufficient evidence. Boye Aff. ¶¶ 9; DE 18 at 1.

Pettus filed his original complaint in this court on March 29, 2010, DE 1, and amended it slightly on July 30, 2011, DE 18.[5] Pettus asserts two claims under 42 U.S.C. § 1983: false arrest

---

[5] The amendment added no new claims. Instead, it replaced an allegation in the original Complaint that Pettus "was found not guilty" at his criminal trial, DE 1 at 6, with an allegation that the trial ended when defendant "Boye moved to dismiss the indictment" because there was "insufficient evidence to prosecute." DE 18 at 1.

against the Police Defendants, and malicious prosecution against all defendants. Complaint at 2.[6]

In an order dated December 22, 2010, the court prospectively referred the instant motion to me. On February 24, 2011, the defendants filed the instant motion along with all of the parties' submissions relating to that motion. DE 51; DE 52; DE 53; DE 54; DE 55; DE 56.

II.    Discussion

A.    Summary Judgment

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). In determining whether to grant summary judgment, a court is confined to issue-finding, not issue resolution. *Rasmussen v. Sigma Corp. of Am.,* 27 F. Supp. 2d 388, 391 (E.D.N.Y. 1998) (citations omitted). The court does not "weigh the evidence and resolve … factual issues" but rather "determine[s] as a threshold matter whether there are genuine unresolved issues of material fact to be tried." *Owens v. New York City Hous. Auth.,* 934 F.2d 405, 408 (2d. Cir. 1991) (quoting *Gibson v. Am. Broadcasting Cos.*, 892 F.2d 1128, 1132 (2d Cir. 1989)); *see also* Fed. R. Civ. P. 56(c). A fact is material if it "'might affect the outcome of the suit under the governing law.'" *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine issue is presented if "'the evidence is such that a reasonable jury could return a verdict for the non[-]moving party.'" *Id*. "[A]ll reasonable inferences are drawn in favor of the non-movant[.]"

---

[6]  The court has previously dismissed Pettus's claims against the City of New York ("City") and public defender Marianna Lowenfeld for failure to state a claim. DE 3. Defendant Karen Hill, a United States Probation Officer, has filed a separate motion for dismissal, DE 40, that remains pending and that I will address in a separate report and recommendation.

*Wellesley v. Debevoise & Plimpton LLP*, 346 Fed. App'x. 662, 662 (2d Cir. 2009). A party opposing summary judgment may not rely solely on allegations in the complaint to establish a genuine issue of material fact. Fed. R. Civ. P. 56(e); *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988). Nor may a party rely on inadmissible evidence to create a triable issue of fact in opposition to a summary judgment motion. Fed. R. Civ. P. 56(c)(2); *see also Advantage Title Agency, Inc. v. Karl*, 363 F. Supp. 2d 462, 465 (E.D.N.Y. 2005) ("the allegations made by Plaintiff … are not sworn to or certified and are not admissible evidence which would effectively rebut the Government's certified records"). The non-moving party must explicitly state the specific material facts as to which it contends there is or is not a genuine issue to be tried, and must support each specification with a citation to admissible evidence in the record. Loc. Civ. R. 56.1.

      B.    <u>False Arrest</u>

          1.    <u>Applicable Law</u>

Pettus claims that the Police Defendants violated his constitutional rights by arresting him without probable cause. A claim for false arrest brought under 42 U.S.C. § 1983, resting on the Fourth Amendment right to be free from unreasonable seizures, is "substantially the same" as a claim for false arrest under state law. *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003); (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). To state a claim for false arrest under New York law, a plaintiff must establish four elements: first, that the defendant intended to confine the plaintiff; second, that the plaintiff was conscious of the confinement; third, that the plaintiff did not consent to the confinement; and finally that the confinement was not otherwise privileged. *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir. 1994) (citation omitted).[7]

---

[7] Construing the *pro se* plaintiff's Complaint liberally, as is required, *see Diaz v. United States*, 517 F.3d 608, 613 (2d Cir. 2008), I assume that Pettus also intended to plead a false imprisonment claim. Adding that claim does not alter the analysis: "False arrest and false imprisonment are

The existence of probable cause is a complete defense to a claim of false arrest. *Weyant*, 101 F.3d at 852 (citations omitted). "Probable cause exists when, based on the totality of circumstances, the officer has knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Finigan v. Marshall*, 574 F.3d 57, 62 (2d Cir. 2009) (citations and quotation marks omitted). Probable cause is assessed on an objective basis; whether it exists "'depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer[s] at the time of the arrest.'" *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)). Where law enforcement officers are cooperating in an investigation, the knowledge of one officer is considered to be shared by all of the cooperating officers. *Savino v. City of New York*, 331 F.3d 63, 74 (2d Cir. 2003) (citing *Illinois v. Andreas,* 463 U.S. 765, 772 (1983)).

"[I]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (internal citations and quotation marks omitted; alteration in original). "[P]robable cause to arrest can exist even when the arrest is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying upon that information." *Coyle v. Coyle*, 153 F. App'x 10, 12 (2d Cir. 2005) (citation omitted). "'[O]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest.'" *Curley v. Vill. of*

---

largely synonymous because an imprisonment starts at the moment of arrest." *Jenkins v. City of New York,* 478 F.3d 76, 88 (2d Cir. 2007) (citations omitted).

*Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (quoting *Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997)).

2.   <u>Analysis</u>

As a threshold matter, the Police Defendants argue that they are entitled to qualified immunity from suit on the false arrest claim. Memo. at 13-15. Because I conclude, for the reasons set forth below, that the officers had probable cause to arrest Pettus, I necessarily also conclude that they enjoy immunity on the false arrest claim. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009) ("The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'") (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

The admissible evidence in the record compels the conclusion that the Police Defendants had probable cause to arrest Pettus for shooting Floyd. At the outset of their investigation, the officers observed bullet holes in the door to Dubose's apartment and the gunshot wounds to Floyd's back. Both Floyd and Dubose explicitly identified Pettus by name as Floyd's assailant, and both gave first-hand accounts of observations that clearly supported that accusation. Both later identified a photograph of Pettus as the assailant. In addition, Floyd provided the police with Pettus's address and a description of his age, height, and clothing; and Dubose provided details of Pettus's prior unsuccessful attempts to locate Floyd to get money from him – an account that provided a possible motive for the attack. With such information at their disposal, the officers were unquestionably privileged to arrest Pettus for having shot Floyd.

Based on Pettus's submissions as well as my review of the record as a whole, there appear to be several ways in which Pettus might seek to overcome the defendants' showing of probable cause (only some of which are clearly articulated in his submissions). First, Floyd denied at trial that he had ever told the police that Pettus shot him, thus creating a potential factual issue as to the officers' reliance on Floyd's identification of Pettus as his assailant. Second, Pettus contends that the transcript of Dubose's 911 call – in which she refers to a ten-minute time period – undermines the officers' reliance on her account of the relevant events. Third, Pettus claims that Scarcella fabricated evidence. Finally, Pettus assails the adequacy of the police investigation that preceded his arrest. As discussed below, none of those assertions suffices to defeat the Police Defendants' motion for summary judgment on the false arrest claim.

a.    <u>Floyd</u>

As noted above, Floyd did not support the prosecution's case with his testimony at Pettus's criminal trial. Specifically, Floyd testified that he did not know who had shot him and denied having ever told the police that it was Pettus who had done so. Floyd Tr. at 10-11. That testimony is difficult to credit, not only because of the several contemporaneous reports ascribing to Floyd a statement that Pettus had shot him, but also because the record includes the transcript of a recording in which Floyd actually did make such an accusation. However, such credibility determinations are for a jury, and I do not base my recommendation on the proposition that no rational fact-finder could rely on Floyd's former trial testimony as a matter of law. There are instead at least two alternate reasons to conclude that Floyd's former trial testimony does not create a triable issue of fact.

First, the transcript of Floyd's former trial testimony itself is not admissible evidence in this case, and therefore cannot serve to create a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(c)(2). Floyd's testimony at the earlier trial is hearsay for purposes of this case. *See* Fed. R. Evid. 801(a)-(c). It does not fall within any exception to the definition of hearsay. *See* Fed. R. Evid. 801(d). Nor does it fall within any of the exceptions to the hearsay rule for which the availability of the declarant is immaterial. *See* Fed. R. Evid. 803. Although it appears that Floyd will not be a witness at the trial of this case,[8] the record discloses no reason to conclude that Floyd is unavailable to testify; as a result his former trial testimony is not admissible under any exception to the hearsay rule predicated on the declarant's unavailability. *See* Fed. R. Evid. 804. Moreover, even if Floyd were unavailable, his testimony could not be admitted in evidence against the Police Defendants because neither they nor any predecessor in interest "had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Fed. R. Evid. 804(b)(1). Because Pettus has not explained how Floyd's recantation could be presented to the jury at the trial in this case, he fails to create any triable issue of fact as to whether Floyd did indeed identify Pettus as his assailant. *See* Fed. R. Civ. P. 56, advisory committee's notes (describing addition of subsection (c)(2) in 2009 amendments to Rule 56: "The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated.").

Second, Floyd's trial testimony, even if taken at face value, does not undermine the proposition that Floyd did provide sufficient information to the officers – both directly and, through Dubose's statements to the police, indirectly – to allow the Police Defendants to infer that

---

[8] Pettus was required to identify any witnesses he might seek to call at trial, and to update that witness list as necessary throughout the discovery period. *See* DE 21 (Case Management and Scheduling Order) ¶ 1. In producing discovery pursuant to that order, Pettus did not list Floyd as a witness, *see* DE 25, and has never supplemented that production with a witness list that includes Floyd's name. Moreover, no party has sought to depose Floyd. *See* DE 31.

Pettus had shot him. To be sure, in his former trial testimony, Floyd stated that he did not "know" who shot him – but he also confirmed that he had told the police that Pettus had been outside his door, that nobody had been in the hallway with Pettus at the time, that he had initially told the police (in an account he recanted only after the arrest) that he had been shot some five seconds after closing the door on Pettus, and that he had identified Pettus in a photograph shown to him by the police. *See* Floyd Tr. at 10-11. Moreover, as far as the record reveals, nothing in Floyd's trial testimony in any way undermines the proposition that Floyd told Dubose that Pettus had shot him, as Dubose reported to the police when they arrived.[9] Thus, even if a fact-finder were to credit Floyd's trial testimony, it would still have no reason to doubt that Floyd's undisputed statements to the officers gave the Police Defendants probable cause to believe that Pettus had shot Floyd through the apartment door.

If the court agrees with the foregoing analysis, it need proceed no further in considering the existence of potential factual disputes, because the information Floyd provided to the police sufficed on its own to permit the Police Defendants to arrest Pettus. Even if the court rejects that analysis, however, it should still grant summary judgment on the false arrest claim for the reasons explained below.

b.    Dubose

Pettus contends that when Dubose made her call for assistance, she told the 911 operator that the gunshots came through the door ten minutes after Pettus left – meaning that she had no

---

[9] Indeed, there can be no question but that on the night of the shooting, *someone* had advised the police that "Lamont" was a suspect. *See* 911 Tr. at 6 (transcript of police communications: "Looking for black male. 33 years old with a Yankee jacket and blue jeans, (unclear). First name is Lamont." The description of the clothing "Lamont" was wearing matched the description that Scarcella reported having received from Floyd at the scene of the shooting. *See* Scarcella Aff. ¶¶ 6-8.

reason to identify Pettus as the assailant. *See* Pettus Aff. ¶ 5. As explained below, I conclude that his reliance on the 911 transcript does not create a genuine dispute of material fact.

First, Pettus relies on a misrepresentation of the transcript's text. In the passage he cites, Dubose simply does not say that Floyd was shot ten minutes after he closed the door on Pettus. Instead, she says only that the person who had knocked on her apartment door had done so "[a]bout ten minutes ago" as of the time of her statement (which appears three pages into the transcript of the call). 911 Tr. at 15. Second, in an earlier part of the same call Dubose described the circumstances of the shooting in a manner that clearly suggested it occurred almost immediately after the apartment door closed on Pettus, and not later: "we was here eating dinner, someone rang the bell. He said not now. I [sic] closed the door and they shot through the door." *Id*. at 14. Third, even if the call could fairly be characterized as Pettus has described it, that fact would do nothing to undermine the uncontroverted fact that Dubose gave statements to the officers who came to her apartment that plainly gave them probable cause to arrest Pettus: namely, that Floyd had been shot immediately after closing the door on their visitor, and that Floyd had told her the assailant was Pettus. *See* Lamassa Aff. ¶¶ 9-11.

c.    Scarcella

Pettus also attempts to raise a factual dispute with respect to his claim that Scarcella "fabricated" the evidence against him. Pettus Aff. ¶ 10. In doing so he relies on Scarcella's testimony at the criminal trial, but none of that testimony creates any genuine issue of material fact with respect to the existence of probable cause.[10] In the portion of Scarcella's cross examination that Pettus has submitted, Scarcella admitted that he completed a complaint report worksheet only

_____

[10] Because Scarcella is a party-opponent to Pettus in this case, his testimony at the earlier criminal trial, unlike Floyd's testimony at the same proceeding, is not hearsay. Fed. R. Evid. 801(d)(2)(A).

after he returned to his precinct, relying on his memory of statements made at the scene of the shooting some two hours before; Scarcella also acknowledged that he had "guessed" when he indicated in his report that Floyd had no gang affiliation. Scarcella Tr. at 4, 7. This evidence does not support Pettus's conclusory assertion that Scarcella knowingly reported anything false, or even inaccurate. More fundamentally, it does not remotely undermine the proposition that the Police Defendants had probable cause to arrest Pettus, nor does it create a genuine issue of material fact as to any part of the information on which they relied in making that determination.

        d.     <u>Failure To Investigate</u>

Pettus further contends that he is entitled to prevail (or at least proceed to trial) on his false arrest claim because the evidence demonstrates that the Police Defendants relied on circumstantial evidence and failed to conduct a sufficient investigation before arresting him. Complaint at 3; Pettus Aff. ¶¶ 4-10. I disagree.

First, to the extent Pettus faults the police specifically for relying on circumstantial evidence, he is plainly wrong as a matter of law. *See*, *e.g.*, *United States v. Daccarett*, 6 F.3d 37, 56 (2d Cir. 2003) ("A finding of probable cause may be based on … circumstantial evidence."); *Velardi v. Walsh*, 40 F.3d 569, 574-75 (2d Cir. 1994); *Stokes v. City of New York*, 2007 WL 1300983, at *6 n.5 (E.D.N.Y. May 3, 2007) (granting summary judgment to defendants on Section 1983 false arrest claim where circumstantial evidence sufficed to create probable cause for plaintiff's arrest). Because the effort to discover the identity of an assailant in a shooting through a closed door would appear to be the paradigm of an investigation that necessarily relies on circumstantial evidence, the rule Pettus proposes would perversely provide a virtual guarantee that such an assailant could not lawfully be arrested.

Second, once police have established probable cause to arrest a suspect, the law does not require them to investigate further in the absence of any reason to believe that the determination of probable cause rests on faulty information. Indeed, "'[t]he fact that an innocent explanation may be consistent with the facts alleged ... does not negate probable cause,' … and an officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause."

*Panetta*, 460 F.3d at 395-96 (quoting *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985)) (brackets and first ellipsis in *Panetta*).

> Although the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause, an officer need not explore and eliminate every theoretically plausible claim of innocence or prove plaintiff's version wrong before arresting him, even if an investigation might have cast doubt upon the basis for the arrest.

*Kilburn v. Vill. of Saranac Lake*, 413 F. App'x 362, 363-364 (2d Cir. 2011) (internal quotation marks and citations omitted).

The Police Defendants received information from both Floyd and Dubose that implicated Pettus, and no one else, in the shooting. No reasonable person would have believed further investigation necessary to establish probable cause to arrest. Just as important, Pettus has not even identified the additional investigative steps he believes the officers should have taken.[11]

Under all of the circumstances of this case, and viewing the record as a whole, there is no genuine issue of material fact as to the existence of probable cause to arrest Pettus. Accordingly, I respectfully recommend that the court dismiss on summary judgment the false arrest claims

---

[11] Moreover, to the extent that Pettus faults Lamassa for accepting as true Scarcella's statements to him about the shooting in the course of the investigation, *see* Pettus Aff. ¶ 10, he ignores both the facts and controlling law. Lamassa did not simply accept Scarcella and McDonough's versions of events, but received further information about the shooter's identity directly from the victim. In any event, police officers are permitted to rely on information they receive from their fellow officers in the course of an investigation. *See Savino*, 331 F.3d at 74.

against the Police Defendants (as well as any false imprisonment claims that Pettus may have intended to assert).

C.    <u>Malicious Prosecution</u>

1.    <u>Applicable Law</u>

"[T]o prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, and establish the elements of a malicious prosecution claim under state law." *Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002) (internal citations omitted).

> The elements of a malicious prosecution claim under New York law are (1) that the defendant initiated a prosecution against the plaintiff, (2) that the defendant lacked probable cause to believe the proceeding could succeed, (3) that the defendant acted with malice, and (4) that the prosecution was terminated in the plaintiff's favor.

*Rohman v. New York City Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000).

"Under New York law, police officers can 'initiate' prosecution by filing charges or other accusatory instruments." *Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010) (citing *Murphy v. Lynn*, 118 F.3d 938, 944 (2d Cir. 1997); *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 568, 571 (2d Cir. 1996)). Probable cause is a complete defense to a malicious prosecution claim. *Savino*, 331 F.3d at 75. Probable cause in the context of malicious prosecution consists of such facts and circumstances as would lead a reasonably prudent person in like circumstances to believe the plaintiff was guilty. *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983); *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003). Probable cause to prosecute generally exists if there was probable cause to make the arrest, unless the discovery of some intervening fact vitiates the basis for the finding of probable cause. *See Lowth*, 82 F.3d at 571; *Kilburn*, 413 F. App'x at 364. Further, a grand jury indictment in the underlying matter provides a presumption of probable cause for a

subsequent malicious prosecution claim that can only be overcome with evidence that the indictment was secured by fraud, perjury, the suppression of evidence, or other bad faith conduct. *Colon*, 60 N.Y.2d at 82-83.

To prevail on the favorable termination element in the absence of an acquittal, the plaintiff must show that the final disposition is otherwise indicative of innocence. *Murphy*, 118 F.3d at 948; *Russell v. Smith*, 68 F.3d 33, 36 (2d Cir. 1995). "When the termination of a case is indecisive because it does not clearly address the merits of the charge, the underlying facts must be examined to determine 'whether the failure to proceed implies a lack of reasonable grounds for the prosecution.'" *Ricciuti*, 124 F.3d at 131.

The fourth element of a malicious prosecution claim, that the proceeding was instituted with "malice," does not require a showing of actual spite or hatred, but only "that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Lowth*, 82 F.3d at 573. New York courts recognize that malice is rarely established through direct evidence, and therefore allow plaintiffs to show it through circumstantial evidence. *Rounseville v. Zahl*, 13 F.3d 625, 630-31 (2d Cir. 1994). Particularly where, as here, the accused and the prosecutors are unknown to each other when the proceeding is initiated, a finding of malice depends on inferences that can reasonably be drawn from the surrounding facts and circumstances. *Martin v. City of Albany*, 42 N.Y.2d 13, 17 (1977).

### 2. Police Defendants

The defendants argue that Pettus has failed to establish any of the four elements required to make out a claim of malicious prosecution. Memo. at 9-13. For the reasons set forth above, I conclude that the Police Defendants had probable cause to arrest Pettus. No intervening

developments dissipated the evidence supporting probable cause before Pettus was charged; to the contrary, on April 9, 2007, Floyd provided additional information implicating Pettus to the prosecutors, who later secured a grand jury indictment against Pettus.

Moreover, the record contains no evidence supporting a finding of malice on the part of the defendants. To be sure, Pettus has made a conclusory assertion that the Police Defendants acted in bad faith, *see* Complaint at 3; Pettus Aff. ¶¶ 1, 3-4, 8, 10-11; but he makes no attempt to adduce or identify any evidence supporting that assertion. Because Pettus plainly cannot establish the first two elements of his claim, the court need not analyze the remaining elements. In short, I respectfully recommend that the court grant the Police Defendants' motion for summary judgment on the malicious prosecution action.

### 3.    Prosecutor Defendants

It is unclear from the pleadings whether Pettus intends to sue the Prosecutor Defendants in their personal or official capacities. Because Pettus seeks damages rather than injunctive relief, *see* Complaint at 6, the Prosecutor Defendants are entitled to Eleventh Amendment immunity from suit in their official capacities. *See Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993) ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.") (citations omitted).

To the extent Pettus seeks to sue the Prosecutor Defendants as individuals, they argue that they are entitled to absolute prosecutorial immunity from suit on the claim for malicious prosecution. Prosecutors are generally entitled to absolute immunity from suit for conduct undertaken in their role as advocates and qualified immunity for conduct undertaken in an

administrative or investigatory context. *See Imbler v. Pachtman*, 424 U.S. 409, 430-31 (1976); *accord Kalina v. Fletcher*, 522 U.S. 118, 126-27 (1997). To decide whether absolute immunity attaches to a particular kind of prosecutorial activity, courts take a "functional approach … which looks to the nature of the function performed, not the identity of the actor who performed it[.]" *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (internal citations and quotation marks omitted). Thus, absolute immunity applies with full force to prosecutorial conduct "intimately associated with the judicial phase of the criminal process[.]" *Imbler*, 424 U.S. at 430. Such conduct includes the initiation and pursuit of a criminal prosecution, including presentation of the State's case at trial, *id.* at 431, the presentation of evidence to a grand jury, *see, e.g.*, *Pinaud v. Cnty. of Suffolk*, 52 F.3d 1139, 1149 (2d Cir. 1995) (granting absolute immunity from suit for claim that prosecutor manufactured a charge through misrepresentations to a grand jury), and the interviewing of witnesses in preparation for trial, *see Buckley*, 509 U.S. at 272-74. When absolute immunity applies, it "spares the official of any scrutiny of his motives" so that allegations of bad faith, malice, or conspiracy do not defeat a claim of absolute immunity. *Dorman v. Higgins*, 821 F.2d 133, 139 (2d Cir. 1987).

The malicious prosecution claim against the Prosecutor Defendants challenges conduct that is squarely protected by absolute immunity: Macayoux presented the case against Pettus to the grand jury, and Boye prepared Floyd to be a witness and handled the trial. Pettus alleges that the defendants "conspired together" to create false evidence. Complaint at 2. Specifically, Pettus accuses Macayoux of fabricating the information she presented at the grand jury, particularly his motive for the shooting. Complaint at 5; Pettus Aff. ¶ 8. Further, Pettus alleges that Boye insisted that Floyd give false testimony about the role Pettus played in the shooting. Complaint at 6; Pettus

Aff. ¶ 9; Floyd Tr. at 12, 15. Even assuming such allegations to be true, Macayoux and Boye are entitled to absolute immunity because all the relevant conduct – initiating, preparing, and trying the case against Pettus – is conduct "intimately associated with the judicial phase of the criminal process[.]" *See Imbler*, 424 U.S. at 430; *Bernard v. Cnty. of Suffolk*, 356 F.3d 495, 506 (2d Cir. 2004) ("as a rule, the knowing presentation of perjured testimony to a grand jury, without any prosecutorial involvement in its earlier inducement" is conduct covered by absolute immunity); *Pinaud*, 52 F.3d at 1149 (prosecutors entitled to absolute immunity from suit on claim that they manufactured a bail jumping charge through misrepresentations to the grand jury); *Dorman*, 821 F.2d at 139 (explaining that allegations of bad faith, malice, or conspiracy do not defeat a claim of absolute immunity). I therefore respectfully recommend that the court grant the Prosecutor Defendants' motion for summary judgment on the malicious prosecution claim.

D.    State Law Claims

In his Complaint, Pettus does not explicitly assert any state law claims; nevertheless, I interpret his *pro se* pleading to assert causes of action under state law that are parallel to the federal claims for false arrest and malicious prosecution, as well as a state law tort claim for assault arising from the allegedly unlawful arrest. The defendants argue that any such state claims fail because Pettus did not comply with the New York's statutory requirement that Pettus provide notice of such claims. *See* Memo. at 17-18; N.Y. Gen. Mun. Law §§ 50-e & 50-i. Those provisions require a plaintiff asserting state tort law claims against a municipal corporation or its employees acting within the scope of their employment to (1) file a notice of claim within 90 days after the incident giving rise to the claim, and (2) commence the action within a year and 90 days after the cause of action accrued. *See*, *e.g.*, *Warner v. Goshen Police Dep't*, 256 F. Supp. 2d 171, 175 (S.D.N.Y.

2003); *Burks v. Nassau Cnty. Sheriff's Dep't*, 288 F. Supp. 2d 298, 301 (E.D.N.Y. 2003). Filing a notice of claim is a mandatory condition precedent to suit against the City and its employees; failure to comply with the notice of claim warrants dismissal. *See*, *e.g.*, *Day v. Moscow*, 955 F.2d 807, 813 (2d Cir. 1992); *Varriccho v. Cnty. of Nassau*, 702 F. Supp. 2d 40, 63-64 (E.D.N.Y. 2010). Under New York common law, a claim for false arrest accrues when the person suing is released from confinement, and a claim for malicious prosecution accrues when the underlying criminal action is dismissed. *TADCO Const. Corp. v. Dormitory Auth. of State of New York*, 700 F. Supp. 2d 253, 273 (E.D.N.Y. 2010). A claim for assault arising from an unlawful arrest accrues at the time of the arrest. *See Grullon v. City of New York*, 635 N.Y.S.2d 24, 25 (App. Div. 1995). Pettus failed to file a notice of claim for any such state cause of action. Moreover, he did not file the Complaint until March 29, 2010, almost two years after the state action against him was dismissed and longer still after his arrest. Accordingly, I respectfully recommend that the court dismiss any state law tort claims the Complaint can be read to assert.

III.   Recommendation

For the reasons set forth above, I respectfully recommend that the court grant the municipal defendants' motion for summary judgment in its entirety.

IV.   Objections

I direct the defendants to serve a copy of this Report and Recommendation on the plaintiff by certified mail, and to file proof of service no later than August 26, 2011. Any objections to this Report and Recommendation must be filed on the electronic docket no later than September 9, 2011. Failure to file objections within this period designating the particular issues to be reviewed waives the right to appeal the district court's order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P.

72(b)(2); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).

SO ORDERED.

Dated: Brooklyn, New York
       August 23, 2011

_____/s/_____
JAMES ORENSTEIN
U.S. Magistrate Judge